# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### October 7, 2014 Session

## DON SANDERS v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Shelby County**
**No. 03-08239      James Lammey, Jr., Judge**

---

**No. W2013-02781-CCA-R3-PC  - Filed February 26, 2015**

---

The Petitioner, Don Sanders, appeals the Shelby County Criminal Court's dismissal of his petition for post-conviction relief seeking relief from his conviction of first degree premeditated murder and resulting life sentence.  On appeal, the Petitioner contends that the post-conviction court erred by ruling that his petition was untimely and by refusing to toll the one-year statute of limitations for his mental incompetence.  Based upon the oral arguments, the record, and the parties' briefs, we affirm the post-conviction court's dismissal of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the Court, in which CAMILLE R. MCMULLEN and TIMOTHY L. EASTER, JJ., joined.

Lance R. Chism, Memphis, Tennessee, for the appellant, Don Sanders.

Robert E. Cooper, Jr., Attorney General and Reporter; Caitlin Smith, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Glen Baity, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### I.  Factual Background

This case relates to the Petitioner's first degree premeditated murder conviction for stabbing and burning his girlfriend, Marilyn Hughes, in March 2003.  The Petitioner appealed his conviction to this court, arguing that the evidence failed to show that he possessed the mental capacity to premeditate the killing, and this court affirmed his conviction on April 22, 2008.  See State v. Don Sanders, No. W2006-02592-CCA-R3-CD,

2008 Tenn. Crim. App. LEXIS 311, at *1 (Jackson, Apr. 22, 2008). The Petitioner did not file an application for permission to appeal to our supreme court.

On January 24, 2011, the Petitioner filed a petition for post-conviction relief, alleging that he received the ineffective assistance of counsel at trial and that he suffered from severe mental illness. In the petition, the Petitioner claimed that he mailed a timely petition for post-conviction relief on or about January 6, 2009, and that he did not learn until September 2010 that the petition was never filed. In support of his claim, he attached a copy of the January 2009 petition. In the alternative, the Petitioner alleged that the post-conviction court should toll the statute of limitations for filing the petition because he had been declared incompetent in Davidson County's Seventh Circuit Court, Probate Division. The Petitioner attached a copy of a June 2008 order from that court, finding that he was disabled within the meaning of Tennessee Code Annotated section 34-1-101 and appointing a conservator to give consent for his medical treatment. The State responded that the post-conviction court should dismiss the January 2011 petition as untimely.

The post-conviction court appointed counsel and held evidentiary hearings on the timeliness of the petition in 2012 and 2013. At the first hearing in May 2012, Anthony Clark testified that he had been housed at the Lois Deberry Special Needs Facility in Nashville since 2005 and was one of two inmate legal clerks. He said the clerks were responsible for processing inmates' requests for legal addresses, case citations, or help with power-of-attorney documents. For post-conviction cases, the clerks provided inmates with "post-convictions or 1983 forms for civil lawsuits." Clerks kept a journal in which they recorded the help they provided to inmates. Clark said he provided help to the Petitioner and "logged all interactions."

Clark testified that his first interaction with the Petitioner occurred on March 7, 2007, when the Petitioner asked for information about the Tennessee Department of Correction policy regarding inmate rules. Two days later, the Petitioner requested to meet with Clark about filing a civil lawsuit. On April 21, 2007, Clark met with the Petitioner and gave him a grievance form. On June 5, 2008, Clark met with the Petitioner for a second time. The meeting lasted ten to fifteen minutes and occurred in the maximum security unit where the Petitioner was housed. Clark asked the Petitioner some questions, advised him that he had only one or two weeks to file his petition for post-conviction relief from his first degree murder conviction, and gave him a post-conviction packet. Clark said the Petitioner never showed him this court's opinion affirming the Petitioner's conviction. Therefore, Clark was unaware that this court had filed its opinion on April 22, 2008. Clark acknowledged that the Petitioner had another nine months to file the petition for post-conviction relief and said that he did not know why he told the Petitioner that the Petitioner had only one or two weeks. Clark said that during the meeting, the Petitioner "seemed like he was on medication."

Clark testified that the post-conviction packet included instructions on how to file the petition for post-conviction relief. He acknowledged that the instructions did not include an address for where to mail the petition. Instead, the instructions stated that the petition "must be mailed to the appropriate clerk of court." Clark said that legal clerks assumed inmates knew they had to mail the petitions "back to the court they came from" and that he would not have told the Petitioner to mail the petition to the Tennessee Supreme Court. He stated, "I always tell them, you will get a receipt from the court once you file it. But to get anything back as far as a hearing date, it could be a year or more."

Clark testified that on June 10, 2008, he responded to a request by the Petitioner for case law and that he sent the cases to the Petitioner through prison mail. On December 23, 2008, the Petitioner sent Clark "a partially filled out post-conviction packet." The Petitioner did not include a request with the packet, so Clark "wrote a reply back and told him that we didn't know what he needed." On January 8, 2009, Clark sent the Petitioner "a USC form, 1983, which is a lawsuit form." Clark said that on January 23, 2009, he received a request from the Petitioner "for the address to the Supreme Court" and that he sent the address for the Tennessee Supreme Court to the Petitioner. Clark's last interaction with the Petitioner occurred on October 22, 2010, when the Petitioner requested another post-conviction packet. Clark sent the packet to him.

On cross-examination, Clark testified that legal clerks were not allowed to mail documents for inmates and that inmates had to mail their own legal papers. On redirect examination, Clark acknowledged that the Petitioner must have told him something on June 5, 2008, that caused him to think the Petitioner had only two weeks in which to file the petition for post-conviction relief. He said he did not know how inmates "on a max unit" mailed documents from the prison. Upon being questioned by the post-conviction court, Clark testified that the Petitioner "seemed a little confused" during their June 5 meeting but that "they all do."

Randale Ganaway testified that he was a correctional counselor at Deberry Special Needs Facility, that the Petitioner was an inmate in the unit for mental health treatment, and that he was the Petitioner's counselor. Ganaway said that when inmates requested something from him, he prepared a written summary of his discussion with the inmate and entered the summary into the computer. His computer notes reflected that on December 31, 2008, the Petitioner requested the address of the federal courthouse in Nashville and that he gave the address to the Petitioner. The Petitioner also requested the services of a notary and material from the legal library.

Ganaway testified that in order to send mail, an inmate had to put the mail in the "pie flap" of his cell door or give it to a correction officer. Correction officers collected the mail

and put it in a box for each housing unit. Someone from the mail room then collected the mail from the boxes at a certain time each day, Monday through Friday. Ganaway said that "[e]very now and then," he put mail in a unit box for an inmate and that any employee could do so. However, employees were "not allowed to fool with . . . mail outside the units." Ganaway acknowledged that in January 2009, he may have put mail in the unit box for the Petitioner. However, he did not specifically remember doing so. He said, though, that he remembered weighing a package for the Petitioner and telling the Petitioner how many stamps were needed to mail the package. Ganaway did not put stamps on the package for the Petitioner.

On cross-examination, Ganaway testified that he did not read inmates' mail and did not know the contents of the Petitioner's package. Upon being questioned by the post-conviction court, Ganaway testified that the prison mail room kept a log book in which employees recorded outgoing legal mail for inmates. Employees did not record outgoing personal mail.

Brenda Maxwell testified that she was a clerical officer and notary public at Deberry. Counsel for the Petitioner showed her a copy of the Petitioner's January 2009 petition for post-conviction relief, and she identified her signature on page eight of the document. She said that the notary seal on the page was "really light" but that she signed the page on January 6, 2009. She stated that the Petitioner's demeanor was always "normal," that he was always cheerful and pleasant, and that he appeared to understand what he was doing. She said clerical officers never put mail into mailboxes for inmates. On cross-examination, Maxwell acknowledged that she did not know if an inmate actually mailed a document she notarized.

Brenda Lyons testified that she was one of two employees in the mail room at Deberry and was working there in January 2009. She acknowledged that inmate mail was deposited into a box on the unit floor and that one of the mail room employees picked up the mail from the box. If an inmate was sending mail to an attorney or a court, the inmate was supposed to write "legal mail" or "privileged mail" on the envelope. One of the mail room employees then would write the envelope's destination and date into a log book. If the inmate did not write "legal mail" or "privileged mail" on the envelope, the mail generally would not get logged into the book. However, if Lyons recognized that the envelope was addressed to a court, she would still log the mail into the book because "common sense would say going to a court is legal." Lyons stated that according to the Deberry log book, the Petitioner sent letters to the United States District Court in Nashville on February 11, 2009, and March 10, 2009. She did not find any other entries for the Petitioner for outgoing mail.

On cross-examination, Lyons testified that an inmate's incoming mail, including returned mail, also was logged into the book. The Petitioner and the State stipulated that

-4-

according to the log book, the Petitioner received two pieces of mail from the United States District Court in Nashville on February 26, 2009.

Rebecca Reding testified that she began working in the Deberry mail room in April 2011 and that legal mail had to be marked as "legal" or "privileged" in order for an employee to log it into the log book. If mail was unmarked, then it was not logged "even if it's to an attorney or a court." She said she did not know if that was the mail room policy in 2009. Upon being questioned by the post-conviction court, Reding stated that if the postal service returned mail to an inmate, "we would open it in front of them and give it back to them."

The Petitioner testified at the second hearing in May 2013 that he was taking Risperdal Consta D for his mental health issues and acknowledged that he had "a clear head." In 2008, he was an inmate at the Deberry Special Needs Facility. In late April 2008, his trial attorney notified him that this court had "denied" his direct appeal, that he had sixty days to appeal to the supreme court, and that she was withdrawing from his case. The Petitioner requested that the prison legal clerk help him file an appeal. About one month later, Anthony Clark visited the Petitioner and told him that he had only two weeks remaining in which to file the appeal. Clark told the Petitioner that the appeal could not be filed in that amount of time and that his only remedy was to file a petition for post-conviction relief. Clark gave the paperwork for the petition to the Petitioner, told him to fill it out, and told him to send it to "the Supreme Court." Clark also told the Petitioner that it would take one year or one and one-half years to hear anything about the petition. The Petitioner said that when Clark told him to send the petition to the supreme court, he thought Clark meant "the Federal Supreme Court."

The Petitioner testified that in August or September 2008, he sent the petition to Clark because he needed help filling it out. Clark did not respond to the Petitioner's request, so the Petitioner asked another inmate for help. The inmate filled out the petition for the Petitioner in September or October 2008. In December 2008, possibly December 31, the Petitioner asked counselor Randale Ganaway for the address of the federal supreme court. Ganaway gave him one address but gave him a second address the next day. On January 6, 2009, Brenda Maxwell notarized the petition. That same day or the next day, the Petitioner had a nurse make copies of the petition, and he put the petition into an envelope. The Petitioner asked Ganaway to weigh the envelope for him. Ganaway told the Petitioner the cost of the postage, the Petitioner gave the appropriate number of stamps to Ganaway, and Ganaway put the stamps on the envelope. The Petitioner asked Ganaway to take the envelope to the mail room because the mail had already been picked up for the day. The Petitioner said that Ganaway "left out [of] the unit with it like he was going to take it down . . . to the mail room and give it to them so they can mail it for me."

The Petitioner testified that he did not write "legal mail" or privileged mail" on the envelope and that he gave the envelope to Ganaway for mailing on January 9 or shortly thereafter. One and one-half years later, the Petitioner asked his conservator to check on the status of the petition and learned that he had mailed it to the wrong court. His conservator helped him fill out a second petition, which he filed in January 2011. The Petitioner stated that on February 11, 2009, he mailed a civil lawsuit to the United States District Court in Nashville. He mailed a letter to the district court in March 2009 that could have been related to that lawsuit. The Petitioner acknowledged that on January 19, 2009, he requested the address for "the supreme court" from Clark. He said he made the request "to see if I was gonna get the same information that Ganaway gave me."

On cross-examination, the Petitioner acknowledged that he had "a very good memory" and that he knew he had until April 22, 2009, to file his petition for post-conviction relief. However, when he mailed his original petition, he did not know there were two different supreme courts: the Tennessee Supreme Court and the United States Supreme Court. Therefore, he asked Ganaway only for the federal supreme court address. Ganaway gave him the address for the federal district court in Nashville. The Petitioner did not see Ganaway mail the envelope containing the petition for post-conviction relief and never asked Ganaway if Ganaway mailed it. The Petitioner acknowledged that on January 19, 2009, he requested "the supreme court" address from Clark. He also acknowledged that according to Clark's testimony, Clark sent the address to him on January 23, 2009. However, the Petitioner said he never received it. The Petitioner acknowledged that in November 2007, he filed a federal "1983 complaint," suing the State of Tennessee. He said he mailed the complaint to the federal district court in Nashville and that he filed a second federal complaint in 2009. However, he did not know that he was supposed to write "privileged" or "legal mail" on the envelopes.

The Petitioner testified that he thought former United States President Bush did not want him to get a new trial because "the things that happened in my case, you know will open a lot of doors to a lot of things and to a lot of people." Regarding whether he actually mailed his January 2009 petition, he stated that "why would I go through the process of [notarizing it] and not send it off." He acknowledged that the federal district court sent some mail to him in February 2009 but said that the court did not return his post-conviction petition. He acknowledged that every other time he mailed something to the federal district court, he received a response from the court. When he mailed his post-conviction petition, though, he did not receive a response. Nevertheless, he assumed the court received his petition.

On redirect examination, post-conviction counsel noted that according to Ganaway's notes, he gave the Petitioner the district court address with a zip code of 37015, the zip code for Ashland City, Tennessee, not Nashville. The Petitioner acknowledged that the incorrect

zip code may have resulted in his petition having never been delivered to the federal courthouse in Nashville.

Upon being questioned by the post-conviction court, the Petitioner acknowledged that in trial counsel's April 2008 letter, she advised him that he could appeal his conviction to the Tennessee Supreme Court. He said that despite the letter, he did not know there was a Tennessee Supreme Court. The post-conviction court responded, "So, I'm supposed to believe that?" The Petitioner acknowledged that prior to his conviction in this case, he had a drug conviction and a conviction for aggravated assault. He said that he gave a false name when he was arrested for the drug charge, said that he served "time" for the convictions, and acknowledged that he was not a "stranger" to the criminal justice system. He said he had been taking Risperdal for his mental health issues for fifteen or sixteen years.

Dr. Renee Glenn, a psychiatrist, testified at the third hearing in September 2013 that she worked at Deberry from 2007 to 2010 and that Deberry inmates were "either homicidal, suicidal, or dangerous by means of their thinking." When the Petitioner arrived at Deberry in 2007, he was very agitated, anxious, suspicious, and paranoid. He thought the staff was poisoning him and trying to destroy him. Dr. Glenn said that he was "preoccupied with the Bush administration, . . . and he was writing copious letters regarding the Bush administration and how he felt that they were out to destroy him." She said that the Petitioner was "acutely psychotic" and that she diagnosed him with anti-social personality disorder and paranoid schizophrenia. The Petitioner did not think he needed medication and would refuse to take it, so he was forcefully injected with tranquilizers. The medication was "significantly helpful" in that it made him less agitated and paranoid and restored his ability to eat and sleep. In May 2007, Dr. Glenn recommended that a conservator be appointed to make decisions about the Petitioner's medical treatment.

Dr. Glenn testified that in 2007 and 2008, the Petitioner "was probably delusional everyday." However, by being on medication, he was able to refrain from making his delusions known. In January 2008, the Petitioner thought that a security officer was poisoning his food and lost weight because he stopped eating for a while. He also thought that "the offspring of Bush" were trying to harm him. In June 2008, a conservator was appointed to manage his medical treatment. Dr. Glenn acknowledged that by January 2009, the Petitioner had been stabilized and that prison officials decided to discharge him from Deberry. The Petitioner was transferred to Riverbend Maximum Security Institution in April 2009 but continued to have a conservator. In the fall of 2009, the Petitioner's conservator decided to stop his medications due to his improvement. Dr. Glenn said the Petitioner "began to slowly decompensate again to becoming very delusional, very paranoid. He started hearing voices again."

Dr. Glenn testified that the Petitioner was transferred back to Deberry in March 2010, stayed there one month, and was returned to Riverbend without his medication. In September 2010, he returned to Deberry because he was "rubbing feces on the wall and the floors and talking about Bush again - just really having lots of delusions." In November 2010, the Petitioner returned to Riverbend. Dr. Glenn said that his going back and forth between the two institutions demonstrated that paranoid schizophrenia was a "chronic relapsing life-long illness that sometimes allows for remissions, and it waxes and [wanes] throughout a person's lifetime." When Dr. Glenn last saw the Petitioner in September 2010, he was still paranoid and anxious. In October 2010, he told someone that he was the brother of Jesus and that the prison staff was trying to kill him.

Dr. Glenn testified that in December 2008 and January 2009, the Petitioner was housed in Deberry's "acute unit," meaning that he was either on suicide watch or in mental health seclusion. She said that the Petitioner was always preoccupied with his case and that "I'm sure there were times when he was in fairly good remission. He might have been able to do some [legal work]." However, when the Petitioner was "acutely psychotic and really sick . . . , it's hard to imagine that [he] would be able to concentrate to carry out one or two step kinds of processes." She said that she never tested the Petitioner's IQ but that "we felt like he was . . . of possibly lower average intellect." The Petitioner spent a lot of time writing letters. Although his letters contained spelling and grammatical errors, "he was pretty much getting his message across."

Dr. Glenn testified that the Petitioner suffered from a mental disease or defect, paranoid schizophrenia. Post-conviction counsel asked if the paranoid schizophrenia prevented the Petitioner from understanding his legal position and the options available to him. Dr. Glenn answered, "Possibly, but not necessarily is the best way I can answer it." She explained that his ability to understand his legal position depended on his delusional state at the time. Defense counsel also asked if the Petitioner's paranoid schizophrenia prevented him from making a rational choice among his options. Dr. Glenn said yes, and cited as an example the Petitioner's inability to choose to take medication that would help him.

Dr. Glenn testified that one time, she thought the Petitioner was malingering by exaggerating the side effects of his medication. However, she never thought he was malingering with regard to his schizophrenia symptoms.

On cross-examination, Dr. Glenn testified that the Petitioner "did have lucid moments . . . [w]hen he was on medication." At those times, he could communicate with prison staff "pretty well." The Petitioner had a "low average IQ" but could read and write and was "streetwise." She said that he was "able to articulate what his needs and desires were very

well" and that it was "possible but not probable" that he could exaggerate his psychosis. She acknowledged that in January 2009, she thought the Petitioner was well enough to leave Deberry. The Petitioner was still delusional but appeared to be doing very well and kept his underlying paranoid thoughts to himself. At that time, he may have been able to make rational decisions. Dr. Glenn acknowledged that the Petitioner's requesting legal documents and filing those documents were rational behaviors and demonstrated that he was exercising his legal options. The Petitioner's asking for legal papers and where to file them showed that he "certainly is processing some of that information." On redirect examination, Dr. Glenn testified that "I have to say just because someone is mentally ill, doesn't mean that they can't make a good decision about some things; but, generally, the illness interferes in every aspect of their lives."

The Petitioner was recalled by post-conviction counsel and acknowledged that he filed "some federal 1983 lawsuits" from 2007 to 2009, while he was in Deberry. Counsel asked how he got the idea to file the lawsuits, and the Petitioner stated that "the guy [who] witnessed the incident" told him that he could file "a 1983 civil suit." On cross-examination, the Petitioner acknowledged that he decided to file the lawsuit and that he understood he could receive money for having been mistreated. The Petitioner filed the lawsuit on February 12, 2009, and no one forced him to do so. He acknowledged that he understood the difference between a federal 1983 lawsuit and a post-conviction petition but said that he "thought the post conviction was for federal too."

In a written order filed in November 2013, the post-conviction court dismissed the petition for post-conviction relief as untimely. First, the court concluded that the Petitioner failed to show that he delivered the original petition to the appropriate individual at the prison for mailing because the prison log book did not show any mail as having been mailed by or returned to the Petitioner in January 2009. The court noted that the Petitioner had successfully filed other lawsuits and that the proof showed he knew the prison's procedure for mailing legal documents. The court also noted the Petitioner's testimony that he delivered the petition to Ganaway for filing. However, the court found that the Petitioner's credibility was "quite weak" and "clouded by dishonesty." The court also found the Petitioner's claim that he did not know about the existence of the Tennessee Supreme Court to be "incredulous." In sum, the court concluded that the log book's failure to show that the Petitioner mailed the petition in January 2009 was "highly persuasive that no such event actually occurred."

Regarding whether the Petitioner's mental incompetence tolled the statute of limitations, the court found that the Petitioner was competent during the one-year period for filing the petition. The court acknowledged that the Petitioner suffered from a mental disease or defect, paranoid schizophrenia, during that period. However, the court concluded that the

Petitioner was well-aware of the legal options available to him at that time, noting that the Petitioner filed lawsuits against the state, asked the prison legal clerk for documents, and testified that he knew he had until April 22, 2009, to file the petition for post-conviction relief. Finally, the post-conviction court concluded that, despite the Petitioner's mental disease, he was "undeniably" capable of making a rational decision about the legal options available to him. The post-conviction court stated that according to the Petitioner's own testimony, he understood there was a one-year deadline in which to file the petition, knew the deadline was April 22, 2009, and "knew who in the prison complex to ask to obtain instructions about the post-conviction petition or other legal needs (the library clerk), and he did so frequently." In short, the court concluded that the Petitioner knew that filing the post-conviction petition was an option, that the prison legal clerk provided him with the "necessary tools" to file the petition, and that the Petitioner "did not follow through before the statute of limitations ran."

## II. Analysis

The Petitioner contends that the post-conviction court erred by dismissing the petition because his testimony established that he timely delivered the January 2009 petition to Ganaway for filing. In support of this claim, the Petitioner cites to Clark's testimony that Clark provided the Petitioner with a blank petition on June 5, 2008, that Clark received a partially completed petition from the Petitioner on December 23, 2008, and that the Petitioner requested the address of "the supreme court" on January 19, 2009. The Petitioner also cites Brenda Maxwell's testimony that she notarized the petition on January 6, 2009, and Randale Ganaway's testimony that he weighed an envelope for the Petitioner and placed the envelope in the unit mailbox sometime in January 2009. The Petitioner contends that from the witnesses' testimony, it is logical to conclude that he mailed the petition, albeit to the wrong court. In the alternative, the Petitioner contends that his mental incompetence tolled the one-year statute of limitations. The State argues that the post-conviction court properly dismissed the petition as untimely. We agree with the State.

"Relief under [the Post-Conviction Procedure Act] shall be granted when the conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103. However, to obtain relief

> a person in custody under a sentence of a court of this state must petition for post-conviction relief under this part within one (1) year of the date of the final action of the highest state appellate court to which an appeal is taken, or if no appeal is taken, within one (1) year of the date on which the judgment became final, or

-10-

consideration of such petition shall be barred.

Tenn. Code Ann. § 40-30-102(a); see also Williams v. State, 44 S.W.3d 464, 468 (Tenn. 2001). The statute emphasizes that time is of the essence of the right to file a petition for post-conviction relief or motion to reopen established by this chapter, and the one-year limitations period is an element of the right to file such an action and is a condition upon its exercise. Tenn. Code Ann. § 40-30-102(a). Moreover, "if papers required or permitted to be filed . . . are prepared by or on behalf of a pro se petitioner incarcerated in a correctional facility. . . , filing shall be timely if the papers were delivered to the appropriate individual at the correctional facility within the time fixed for filing." Tenn. Sup. Ct. R. 28 § 2(G).

The Petitioner contends that his petition for post-conviction relief was timely because he delivered it to Ganaway for mailing in January 2009. However, although the petition reflects that the Petitioner signed it in the presence of a notary on January 6, 2009, and Ganaway said he may have put an envelope in the outgoing mailbox for the Petitioner, nothing demonstrates that the envelope in question contained the petition. Moreover, the post-conviction court discredited the Petitioner's testimony that he gave the petition to Ganaway and concluded that the Petitioner never mailed the petition. Issues regarding the credibility of witnesses, the weight and value to be accorded their testimony, and the factual questions raised by the evidence adduced at trial are to be resolved by the post-conviction court as the trier of fact. See Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997). Therefore, the post-conviction court's findings of fact are entitled to substantial deference on appeal unless the evidence preponderates against those findings. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001). Given that the prison log book shows no outgoing mail for the Petitioner in January 2009, the evidence does not preponderate against the findings of the post-conviction court.

Next, the Petitioner contends that the post-conviction court should have held that due process required tolling the statute of limitations for his mental incompetence. Our supreme court has held that due process may require tolling the statute of limitations. Whitehead v. State, 402 S.W.3d 615, 622-23 (Tenn. 2013). Specifically, the court has identified the following three circumstances in which due process requires tolling the statute of limitations: (1) when the claim for relief arises after the statute of limitations has expired; (2) when the petitioner's mental incompetence prevents compliance with the statute of limitations; and (3) when the petitioner's attorney has committed misconduct. Id. at 623-24. The second exception is at issue in this case.

The standard for determining a petitioner's competency is

whether the petitioner possesses the present capacity to

-11-

> appreciate the petitioner's position and make a rational choice with respect to continuing or abandoning further litigation or on the other hand whether the petitioner is suffering from a mental disease, disorder, or defect which may substantially affect the petitioner's capacity.

Tenn. Sup. Ct. R. 28 § 11(B)(1); Reid ex rel. Martiniano v. State, 396 S.W.3d 478, 512 (Tenn. 2013) (holding that the standards and procedures in Tenn. Sup. Ct. R. 28 § 11 should be used when a petitioner seeks to toll the statute of limitations based on mental incompetence). The petitioner has the burden of proving mental incompetence by clear and convincing evidence. Reid ex rel. Martiniano, 396 S.W.3d at 513.

"The trial court should begin with a presumption that the petitioner is competent." Id. at 512. The court then should use the following three step test:

> (1) Is the person suffering from a mental disease or defect?
>
> (2) If the person is suffering from a mental disease or defect, does that disease or defect prevent him from understanding his legal position and the options available to him?
>
> (3) If the person is suffering from a mental disease or defect which does not prevent him from understanding his legal position and the options available to him, does that disease or defect, nevertheless, prevent him from making a rational choice among his options?
>
> If the answer to the first question is no[;] the court need go no further, the person is competent. If both the first and second questions are answered in the affirmative, the person is incompetent and the third question need not be addressed. If the first question is answered yes and the second is answered no, the third question is determinative; if yes, the person is incompetent, if no, the person is competent.

Id. at 513 (quoting <u>Rumbaugh v. Procunier</u>, 753 F.2d 395, 398-99 (5th Cir. 1985)). Furthermore,

> [t]he third step asks whether a prisoner, despite his or her mental disease or defect, is capable of making a rational choice from among the available post-conviction options. A decision may be rational even when it is not one that the majority would consider acceptable, sensible, or reasonable. A decision is rational when it is based on a process of reasoning. [<u>In re Conservatorship of Groves</u>, 109 S.W.3d 317, 336 (Tenn. Ct. App. 2003)]. A person's decision-making process is rational when that person can (1) take in and understand information; (2) process the information in accordance with his or her personal values and goals; (3) make a decision based on the information; and (4) communicate the decision. <u>Groves</u>, 109 S.W.3d at 335.

<u>Id.</u>

In this case, the post-conviction court properly considered the three-step <u>Rumbaugh</u> test and answered the first question in the Petitioner's favor. However, the post-conviction court answered the second question as to whether the disease or defect prevented the Petitioner from understanding his legal position and the options available to him in the negative. The post-conviction court then recognized that the issue turned on the third question as to whether the disease or defect nevertheless prevented the Petitioner from making a rational choice among his options. The court again answered in the negative. Given, as the court noted, the Petitioner's testimony that he understood he had a right to file a post-conviction petition, that he knew he had until April 22, 2009, to do so, that he chose to file the petition, and that he took the appropriate steps toward filing, we agree with the post-conviction court that he failed to establish his mental incompetence by clear and convincing evidence. Thus, the post-conviction court properly determined that the statute of limitations should not be tolled and dismissed the petition as untimely.

### III. Conclusion

Based upon the oral arguments, the record, and the parties' briefs, we affirm the post-conviction court's dismissal of the petition for post-conviction relief.

_____
NORMA MCGEE OGLE, JUDGE